IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,
Plaintiff,

v.

RAUL AMBRIZ-VILLA, JR.,
Defendant.

Case No. 19–CR–40095–JPG

### <u>MEMORANDUM & ORDER</u>

Before the Court is Defendant Raul Ambriz-Villa, Jr.'s Motion to Suppress. (ECF No. 44). The Government responded, (ECF No. 47); and the Court conducted a hearing on August 18, 2020, (ECF No. 51). For the reasons below, the Court **DENIES** Ambriz-Villa's Motion to Suppress.

## I.     PROCEDURAL & FACTUAL HISTORY

On October 30, 2019, Illinois State Trooper John Payton ("Trooper Payton") was parked in his law-enforcement vehicle on I-57 near Mt. Vernon, Illinois.[1] Trooper Payton is a member of the Criminal Patrol Team and is specially trained in interdiction: to stop and apprehend those traveling along interstate highways suspected of criminal activity. He has 11 years of experience, which includes over 70 successful contraband seizures since 2015 and the rescue of an abducted child. He stops three-to-four drivers per day. And although he is authorized to issue traffic tickets, his focus is on interdiction. Along with fieldwork, Trooper Payton conducts in-class instruction and ride-alongs to pass his experience on to rookies.

Ambriz-Villa drove past Trooper Payton while driving south on I-57. He was driving a 2009 Chevy Suburban with a Nebraska license plate. In Trooper Payton's experience, large vehicles (like Suburbans) are preferred by drug traffickers because they can haul more contraband.

---

[1] The facts are drawn from the Indictment, the parties' briefs, the hearing testimony, and the dash-cam recording.

Trooper Payton also found the vehicle's dirty exterior and foreign plates as signs of long-distance interstate travel, consistent with trafficking.

Trooper Payton briefly followed Ambriz-Villa on I-57, during which time Ambriz-Villa's vehicle crossed the solid white line on the right-hand shoulder. Trooper Payton then conducted a traffic stop. He asked Ambriz-Villa for his license and registration. It took Ambriz-Villa near 90 seconds to produce his registration. That struck Trooper Payton as suspect—in his experience, drug traffickers often drive rentals and do not know where to find the vehicle's registration. Trooper Payton also noticed a "masking odor," like that of an air freshener or cologne, sometimes used to conceal the tracks of contraband; and two cell phones, sometimes used by traffickers as "dope phones." Trooper Payton then asked Ambriz-Villa if he would be willing to continue the inquiry from his law-enforcement vehicle.[2] Ambriz-Villa agreed.

When Ambriz-Villa sat down, Trooper Payton informed him that he was only receiving a warning ticket. In Trooper Payton's experience, innocent drivers relax when they learn that they are not receiving a moving violation. But Trooper Payton noticed that the news had little effect on Ambriz-Villa. The dash-cam recording showed Ambriz-Villa's eyes pacing out the window and through the mirrors; and Trooper Payton purportedly saw belly breathing and a prominent carotid artery, which sometimes conveys nervousness.

Several uneasy statements made by Ambriz-Villa also alerted Trooper Payton of the possibility of criminal activity. While processing Ambriz-Villa's license, Trooper Payton casually asked about his background and purpose for traveling.[3] Ambriz-Villa stated that he owned a tire shop in Nebraska and was traveling to Georgia for his nephew's birthday. He said that his family

---

[2] Trooper Payton testified that it is the Criminal Patrol Team's custom to invite suspects to their law-enforcement vehicles as a safety measure.

[3] Trooper Payton testified that out-of-state licenses take longer for Illinois police vehicles to retrieve information.

was going to Georgia too, but they flew instead. Trooper Payton asked why he decided to drive alone, and Ambriz-Villa floundered nonresponsive.[4] When asked again, he stated that he liked to drive. After further conversation, Trooper Payton concluded that Ambriz-Villa's evasiveness and excessive nervousness were signs of criminal activity.

By the time Trooper Payton printed the warning ticket, Ambriz-Villa was poised to leave. He took it and got halfway out the door when Trooper Payton interjected—"Do you mind if I ask you a few more questions?" Ambriz-Villa agreed. Trooper Payton then asked whether he was involved in any drug or criminal activity, which he denied. Finally, Trooper Payton asked Ambriz-Villa if he would consent to a search of his vehicle—he consented. Trooper Payton asked once again for clarification, and Ambriz-Villa confirmed his consent.

Two other troopers arrived moments earlier in a separate law-enforcement vehicle; Trooper Payton messaged them while processing Ambriz-Villa's license. Together, they searched Ambriz-Villa's Suburban. Hidden in the third row, beneath the tray and cupholder and above the rear driver-side tire, they found around 13 kilograms of methamphetamine.

On November 5, a grand jury in the Southern District of Illinois charged Ambriz-Villa with Possession with Intent to Distribute Methamphetamine. Ambriz-Villa then moved to suppress the drug evidence under the Fourth Amendment. The Government responded; and the Court conducted an in-person hearing, during which it heard testimony from Trooper Payton, examined the dash-cam recording, and heard oral arguments.

---

[4] The extent of Ambriz-Villa's ability to understand the English language remains unclear. Ambriz-Villa's native tongue is Spanish. During the traffic stop, he informed Trooper Payton that he immigrated to the United States from Mexico sometime in the last 20 to 25 years. And he appeared at the August 18 hearing with help from an interpreter, during which he informed the Court that he does not understand any English. The dash-cam recording, however, reflects otherwise.

## II.      LAW & ANALYSIS

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. "No right is held more sacred, or is more carefully guarded, by the common law, then the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891). "Wherever an individual may harbor a reasonable 'expectation of privacy,' he is entitled to be free from governmental intrusion." *Terry v. Ohio*, 392 U.S. 1, 10 (1968); *Katz v. United States*, 389 U.S. 347, 360–61 (1967) (Harlan, J., dissenting). So "[in] cases where the securing of a warrant is reasonably practicable, it must be used . . . ." *Carrol v. United States*, 267 U.S. 132, 156 (1925).

"A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). And "[a] 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *Id.* That said, "what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures." *Elkins v. United States*, 364 U.S. 206, 222 (1960).

If the Government violates the Fourth Amendment by conducting an unreasonable search or seizure, then the *exclusionary rule* "compel[s] respect for the constitutional guarantee in the only effectively available way—by removing the incentive to disregard it." *Id.* "Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *United States v. Calandra*, 414 U.S. 338, 347 (1974).

— 4 —

But "[g]iven the nature of an automobile in transit, the [Supreme] Court recognized that an immediate intrusion" is not unreasonable "in cases involving the transportation of contraband goods." *United States v. Ross*, 456 U.S. 798, 806–807 (1982).

> An investigatory stop complies with the Fourth Amendment if the brief detention is based on reasonable suspicion that the detained individual has committed or is about to commit a crime. An officer initiating an investigatory stop must be able to point to "specific and articulable facts" that suggest criminality so that he is not basing his actions on a mere hunch.

*United States v. Uribe*, 709 F.3d 646, 649–50 (7th Cir. 2013) (quoting *Terry*, 392 U.S. at 21–22).

"The government bears the burden of establishing reasonable suspicion by a preponderance of the evidence." *Id.* at 650. But *reasonable suspicion* itself "is a lower threshold than probable cause" and "considerably less than preponderance of the evidence." *United States v. Bullock*, 632 F.3d 1004, 1011 (7th Cir. 2011).

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

*Alabama v. White*, 496 U.S. 325, 330 (1990).

It is now well established "that the Fourth Amendment tolerate[s] certain unrelated investigations that [do] not lengthen the roadside detention." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (citing *Arizona v. Johnson*, 555 U.S. 323, 333 (2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.")). And the Supreme Court has "held repeatedly that

mere police questioning does not constitute a seizure." *Florida v. Bostick*, 501 U.S. 429, 434 (1991).

Courts therefore evaluate *reasonable suspicion* by examining "the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *Bullock*, 632 F.3d at 1012. "If there is no reasonable suspicion of criminal activity, a traffic stop can only last as long as it takes to 'address the traffic violation that warranted the stop' and 'attend to related safety concerns.' " *United States v. Walton*, 827 F.3d 682, 687 (7th Cir. 2016) (quoting *Rodriguez*, 575 U.S. at 354). In other words, "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez*, 575 U.S. at 354. "However, information lawfully obtained during that period may provide the officer with reasonable suspicion of criminal conduct that will justify prolonging the stop to permit a reasonable investigation." *United States v. Figueroa-Espana*, 511 F.3d 696, 702 (7th Cir. 2007).

As in *Caballes*, "the initial seizure of [Ambriz-Villa] when he was stopped on the highway was based on probable cause and was concededly lawful." 543 U.S. at 407. (*See* Def.'s Mot. at 5–6). Even so, Ambriz-Villa argues that Trooper Payton violated his constitutional rights in three ways.

*First*, he argues that "Trooper Peyton's questions to Mr. Ambriz-Villa during the traffic stop about whether there was anything illegal in the car, whether anything would alert his drug dog, and whether there were any specific drugs or guns in the vehicle were outside the mission of the traffic stop" and therefore violated the Fourth Amendment. (*Id.*). The Court disagrees.

Ambriz-Villa's assertion that the scope of police questioning is restricted to "ordinary inquiries" lacks legal support. True enough, "[b]eyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquires incident to [the traffic] stop,'" *Rodriguez*, 575 U.S. at 355 (quoting *Caballes*, 543 U.S. at 408), which typically "involves checking the driver's license, determining whether there are outside warrants against the driver, and inspecting the automobile's registration and proof of insurance," *id.* (citing Wayne R. LaFave, 4 Search and Seizure § 9.3(c) (5th ed. 2019)). But drivers may also be "closely questioned about their identities, the reason for their travels, their intended destinations, and the like, and may be quizzed as to whether they have drugs on their persons or in the vehicle." LaFave, *supra*, § 9.3(c). And in the Seventh Circuit, "[a] traffic stop does not become unreasonable merely because the officer asks questions unrelated to the initial purpose for the stop, provided that those questions do not unreasonably extend the amount of time that the subject is delayed." *United States v. Martin*, 422 F.3d 597, 601–602 (7th Cir. 2005); *see also United States v. Muriel*, 418 F.3d 720, 725 (7th Cir. 2005). *See generally* Amy L. Vasquez, *"Do You Have Any Drugs, Weapons, or Dead Bodies in Your Car?": What Questions Can a Policy Officer Ask During a Traffic Stop?*, 76 Tul. L. Rev. 211, 223–23 (2001) (discussing circuit split). The Court therefore disagrees with Ambriz-Villa's assertion that Trooper Payton—while processing the warning ticket—violated the Fourth Amendment merely by asking questions unrelated to the traffic stop.

*Second*, Ambriz-Villa argues that Trooper Payton—after processing the warning ticket— lacked a reasonable suspicion to shift the scope of his investigation from the traffic violation to potential criminal activity. (Def.'s Mot. at 5–6). The Court disagrees.

Ambriz-Villa's circumspect behavior and dubious story gave Trooper Payton reasonable suspicion to expand the scope of the traffic stop after the warning ticket was issued. A driver's

— 7 —

"statements and demeanor" can create "reasonable suspicion of criminal conduct." *Figueroa-Espana*, 511 F.3d at 704; *Martin*, 422 F.3d at 602. And in *Terry v. Ohio*, the Supreme Court reiterated that "due weight must be given . . . to the specific reasonable inferences" that a law-enforcement officer is "entitled to draw from the facts *in light of his experience*." 392 U.S. at 27 (emphasis added). Here, Trooper Payton testified to several indicators that, given his experience, were clues of criminal conduct. Any objective viewer of the dash-cam recording would note Ambriz-Villa's particularly skittish behavior, from erratic eye movements to nervous hat adjustments. Trooper Payton also testified about salt grime on Ambriz-Villa's Suburban, suggesting long-distance driving; the Suburban itself, able to haul greater quantities of contraband; and Ambriz-Villa's belly breathing and prominent carotid artery, sometimes signs of nervousness. Taken as a whole, these specific and articulable facts were enough to give Trooper Payton a reasonable suspicion of criminal conduct.

*Third*, Ambriz-Villa argues that Trooper Paton committed an unreasonable seizure when he continued his questioning after issuing the warning ticket. (Def.'s Mot. at 7–8). He suggests that a reasonable person in his position would not have felt free to leave, and thus "[a]ny consent to stay and talk or search the vehicle by Mr. Ambriz-Villa is tainted by his illegal detainment." (*Id.*). The Court disagrees.

Nothing suggests that Ambriz-Villa was "seized" when Trooper Payton asked him a new question as he was exiting the vehicle.

> [A] person is 'seized' only when, by means of physical force or a showing of authority, his freedom of movement is restrained. As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.

*United States v. Mendenhall*, 446 U.S. 544, 553 (1980). Trooper Payton's tone and behavior did not suggest coercion; and the mere presence of a law-enforcement officer, without more, does not presuppose an inability to leave. *Cf. Florida v. Royer*, 460 U.S. 491, 501–502 (finding that although officers' questioning was "no doubt permissible," driver "was effectively seized" when officers identified themselves as narcotics agents "while retaining his ticket and driver's license and without indicating in any way that he was free to depart"). A reasonable person in Ambriz-Villa's position—with one foot out the door and a warning ticket in hand—would feel at liberty to disregard the questions and walk away.

### III.   CONCLUSION

The Court **DENIES** Defendant Raul Ambriz-Villa, Jr.'s Motion to Suppress.

**IT IS SO ORDERED.**

**Dated: Monday, August 31, 2020**

**S/J. Phil Gilbert**
**J. PHIL GILBERT**
**UNITED STATES DISTRICT JUDGE**
